IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TERRY G. PUGH , | ) | CASE NO. 1:13-cv-02430 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Terry G. Pugh ("Plaintiff" or "Pugh") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 16.   As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Pugh filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on April 6, 2010.[1]  Tr. 12, 68, 82, 96, 97, 98, 112, 126, 145.  He alleged a disability onset date of November 1, 2007.  Tr. 218, 225.  He alleged disability due to COPD, short term memory loss, acute chronic asthma, heart problems, right knee problems, and mental health problems.  Tr. 166, 169, 179, 186, 270.  Pugh's applications were denied initially and

---

[1] The ALJ found that Pugh filed his applications on April 6, 2010.  Tr. 12.  This date is supported by the record (Tr. 68, 82, 96, 97, 98, 112, 126, 145) and is not disputed.  The record also contains a reference to an April 19, 2010, filing date.  Tr. 218, 225.

upon reconsideration by the state agency.[2]  Tr. 166-172, Tr. 179-192.   Pugh requested an administrative hearing.  Tr. 193-197.   On February 22, 2012, Administrative Law Judge Thomas A. Ciccolini ("ALJ") conducted an administrative hearing.  Tr. 35-64.

In his May 22, 2012, decision, the ALJ determined that Pugh had not been under a disability from November 1, 2007.  Tr. 9-29.  Pugh requested review of the ALJ's decision by the Appeals Council.  Tr. 6-8.  On September 3, 2013, the Appeals Council denied Pugh's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.     Personal, educational and vocational evidence

Pugh was born in 1961.  Tr. 218, 225.  At the time of the hearing, Pugh was 50 years old, turning 51 the next month.  Tr. 41.  Pugh lives alone.  Tr. 42.  He completed high school through ninth grade, served in the military,[3] obtained a GED, and completed two years of college courses.  Tr. 41.  Because he was no longer able to afford college, he did not obtain a degree.  Tr. 41.  His past work includes work as an industrial truck operator; order picker; hand packager; stock clerk; and automobile mechanic.  Tr. 39.  He also worked through a temporary agency as a machine operator, sorter, packer, tow motor operator, and chemical mixer.  Tr. 39-40.  He last worked a temporary job building incubators for a company named ChickMaster.  Tr. 43.  In

---

[2] As part of the state agency's consideration of Pugh's applications, based upon its investigation, the state agency found that there was "reason to believe that the claimant knowingly concealed and provided incorrect information concerning his physical ability."  Tr. 67.  Thus, information provided by Pugh regarding his abilities, activities, and functioning was disregarded by the state agency.  Tr. 67, 166.

[3] During the hearing, the ALJ inquired as to whether Pugh was receiving VA benefits as a result of his military service.  Tr. 55.  Pugh indicated that he had not applied for VA benefits, either financial or medical.  Tr. 55.  He stated that he was aware he could receive treatment at the VA hospital because he had gone there once for his knee but was not aware of any entitlement to other benefits.  Tr. 56, 62.

October 2007, Pugh injured his knee at ChickMaster.  Tr. 43, 383.  Pugh reports that he has not worked since that injury.[4]  Tr.  43.

## B.    Medical evidence[5]

### 1.  Treatment history

In March of 2008, Pugh was still experiencing problems with his right knee following his injury at work.  Tr. 390.  There was swelling in his right knee and he was unable to bear weight. Tr. 390.  On March 26, 2008, he underwent an MRI of his right knee.  Tr. 390.  The MRI showed a horizontal tear posterior horn lateral meniscus with complex tear developing, more medially, and a disruption of the anterior horn, also of the lateral meniscus.  Tr. 390.  The remainder of Pugh's knee joint was unremarkable.  Tr. 390.

Upon referral of Pugh's physician Dr. Francine M. Terry, M.D., on April 21, 2008, Pugh saw orthopedic surgeon, Dr. Mark M. Musgrave, M.D., of the Crystal Clinic, for evaluation of his right knee.  Tr. 556-557.  Dr. Musgrave planned to seek workers compensation approval for an arthroscopic partial medial and lateral meniscectomy of the right knee.  Tr. 557.  On May 29, 2009, Dr. Musgrave performed Pugh's right knee arthroscopic surgery.  Tr. 554.

Following surgery, Pugh saw Dr. Kyle J. Wear at the VA for an initial visit on June 19, 2009.  Tr. 576-578.  Pugh was unable to initiate physical therapy because of a lack of insurance. Tr. 576.  Dr. Wear noted marked crepitus of the right knee with very limited range of motion with flexion.  Tr. 577.  There was no erythema or edema of the knee.  Tr. 577.  Dr. Wear

---

[4] Treatment notes from 2008 reflect that Pugh was still working although on restricted duty.  Tr. 380-384.

[5] Certain medical records post-date the ALJ's decision and were submitted only to the Appeals Council.  Tr. 1065-1076.  However, Pugh has made no argument as to why the evidence submitted after the ALJ's decision should be considered and, without a showing that a remand is appropriate for consideration of new evidence, evidence submitted after the ALJ's decision "cannot be considered part of the record for the purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir 2001) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir 1996)).

prescribed Percocet.  Tr. 578.  Pugh started with physical therapy on July 1, 2009, through the VA.  Tr. 563-565, 570.  That same day, Pugh presented to triage reporting that he was unable to get through physical therapy because he was in severe pain.  Tr. 569.  Pugh indicated he was out of pain pills.  Tr. 569.  Dr. Wear felt that Pugh had abused the last prescription of Percocet which was for 60 pills since it had just recently been prescribed.  Tr. 569.  Dr. Wear issued one more prescription but noted that no further pills should be prescribed until Pugh was seen by orthopedics at the VA.  Tr. 569.

On July 6, 2009, Pugh presented for physical therapy using his cane on the wrong side. Tr. 564.  He indicated that he was unable to change the cane to his left hand because it hurt his knee more.  Tr. 564.  Pugh reported that his knee was the size of a softball and his pain level was a 10/10.  Tr. 564.  He indicated that he had walked over an hour the day before on a grass surface with hills.  Tr. 564.  Pugh was unable to continue treatment due to pain and asked for medication but was advised that he would need to see his primary care physician for medication requests. Tr. 564.  On July 8, 2009, Pugh tolerated therapy with only minimal complaints of pain and his ambulation had improved slightly.  Tr. 564.  Pugh failed to show for the next three scheduled visits and, on July 17, 2009, his physical therapy treatment was discontinued due to non-compliance.  Tr. 563.

In addition to the foregoing medical care, Pugh was treated for his knee problems, breathing problems, and cardiac issues by other physicians, including Drs. Khandelwal, M.D. of A & S Khandelwal, MD, Inc.,[6] Dr. Luan O'Connor, and cardiologists at Medina Cardiovascular Associates, Inc. ("Medina Cardio"). He also received treatment at Medina Hospital Emergency Room.

---

[6] The records reflect treatment by two different Drs. Khandelwal.  Both Dr. Anand V. Khandelwal, M.D., (Tr. 1011), and Dr. Vivek Khandelwal, M.D., (Tr. 1019), treated Pugh.

On March 25, 2009, Pugh saw Dr. O'Connor to request a breathing machine.  Tr. 529. She indicated that Pugh was attempting to obtain SSI disability benefits and he indicated that, if he had an order for a nebulizer machine, it would support his case.  Tr. 529.  She noted that Pugh stated he was using his inhaler 6-8 times per day and could hardly breathe.  Tr. 529.  However, during the examination he had no respiratory distress.  Tr.  529.  Dr. O'Connor believed that Pugh was falsifying his complaints in order to get social security.  Tr. 529.  As a precautionary measure, Dr. O'Connor ordered medication.  Tr. 529.

On April 4, 2009, Pugh saw Dr. Khandelwal with complaints of shortness of breath.  Tr. 678.  Pugh reported that his shortness of breath had been present for about 15 years.  Tr. 678.  It was persistent and had worsened over time.  Tr. 678.  Pugh had smoked cigarettes for 30 years and had recently cut down to one pack per day.  Tr. 678-679.  Pugh walked with a normal gait. Tr. 679.  His lower extremities were normal to inspection and palpation.  Tr. 679.  Dr. Khandelwal's assessments included shortness of breath, likely associated with Pugh's smoking abuse, and associated COPD and tobacco use disorder.  Tr. 679.  Pugh continued to see Dr. Khandelwal throughout 2009 and thereafter with reports of shortness of breath.  *See* e.g., Tr. 681, 683, 685, 688, 691, 694.

On May 7, 2009, Medina Cardio performed various tests, including an echocardiogram, a spect myocardial perfusion scan, and a Lexiscan stress test report.  Tr. 946, 956, 957.  The echocardiography report showed mild global LV dysfunctions, LVEF 45%; normal RV function; mild mitral regurgitation, and normal artery pressure.  Tr. 946.  The spect myocardial perfusion scan report showed no evidence of any reversible ischemia and low normal LV systolic function without any obvious wall motion abnormalities.  Tr. 956.  During the Lexiscan injection test,

Pugh complained of some shortness of breath and difficulty breathing but those symptoms resolved once the test stopped.  Tr. 957.  Pugh's ECG was unremarkable.  Tr. 957.

On January 25, 2010, Pugh was seen at Medina Hospital Emergency Room ("Medina ER") with complaints of weakness and lightheadedness.  Tr. 612. Pugh reported an abrupt onset of lower extremity tingling, severe pain, and weakness.  Tr. 612.  He also reported some incontinence, constipation and low back pain.  Tr. 612.  On examination, the consulting physician noted that Pugh's motor strength was extremely functional and his effort was poor so formal testing could not be done.  Tr. 612.  Pugh's muscle tone was normal.  Tr. 612.  The sensory examination was extremely functional with nonanatomic sensory loss over the lower extremities.  Tr. 613.

Pugh was also seen on January 27, 2010, at Medina ER for complaints of chest pain.  Tr. 949.  He denied any associated symptoms with his chest pain but indicated that his shortness of breath was persistent and did not change with his chest pain.  Tr. 949.  The ER physician recommended that Pugh continue with his current medications of Lopressor and Lisinopril with the option of adding a small dose of aspirin each day.  Tr. 950.  No further cardiac workup was indicated.  Tr. 950.

During a February 23, 2010, appointment with Medina Cardio, Pugh indicated that he had still been smoking.  Tr. 947.  He was continuing to have some on and off chest pain but not like it had been.  Tr. 947.  The assessments made by Dr. Than M. Jain, M.D., F.A.C.C., included non-cardiac chest pain; LV dysfunction, clinically stable; and history of COPD.  Tr. 947.  Dr. Jain discussed smoking cessation again with Pugh.  Tr.  947.  Pugh indicated that he would try harder to quit smoking.  Tr. 947.

On May 25, 2010, Pugh saw Dr. Jain at Medina Cardio.  Tr. 951.  Pugh was still smoking but cutting back.  Tr. 951.  He reported that he was doing fairly decent.  Tr. 951.  Dr. Jain indicated that Pugh's LV dysfunction was clinically stable.  Tr. 951.  His low pressure was asymptomatic.  Tr. 951.  He had COPD.  Tr. 951.  Dr. Jain recommended no change in Pugh's medications but she recommended that Pugh schedule an echocardiogram.  Tr. 951.  A June 1, 2010, echocardiography report showed a trace of aortic insufficiency; rapid tricuspid regurgitation; and that Pugh's right ventricular systolic pressure was within normal limits.  Tr. 952.

In August 2010, Pugh was seen at Medina ER for shortness of breath.  Tr. 941-944.  X-rays showed no acute abnormalities but it was noted that Pugh had an element of COPD.  Tr. 944.

In early September 2010, Pugh sought treatment at the Medina ER for back pain.  Tr. 924.  He reported that he had injured his back two days prior while helping a friend move heavy shingles.  Tr. 927, 929, 932.  He was discharged the same day with prescriptions for Flexeril and Vicodin.  Tr. 933, 934.

On September 21, 2010, Pugh sought treatment at the Medina ER for right knee injury/pain.  Tr. 812-821.  A knee x-ray was taken and showed no bone or joint abnormality.  Tr. 923.  He was discharged the same day with instructions to rest, elevate his knee, use a knee brace, take Vicodin as needed for pain, and follow up with his physician.  Tr. 821.  During a visit with Dr. Khandelwal on September 23, 2010, Dr. Khandelwal indicated that Pugh was using a cane to ambulate and he had a brace on his right leg.  Tr. 839.  While Dr. Khandelwal made other assessments,[7] he did not make a specific assessment with respect to Pugh's knee.  Tr. 841.

---

[7] Dr. Khandelwal's assessments included COPD airway obstruction, tobacco use disorder, anxiety disorder generalized, and abnormal weight loss.  Tr. 841.

On October 25, 2010, Pugh saw Dr. Khandelwal again for follow up.  Tr. 845.  He complained of shortness of breath occasionally at night and during the day.  Tr. 845.  He reported using his inhaler twice a day.  Tr. 845.  He denied anxiety, depression, hallucinations and panic disorder.  Tr. 845.  Dr. Khandelwal noted that Pugh was using a cane to ambulate and his right leg was braced.  Tr. 846.  Dr. Khandelwal's assessments included shortness of breath, anxiety disorder generalized, and tobacco use disorder.  Tr. 848.  Dr. Khandelwal advised Pugh that he should see a psychologist and he discussed with Pugh a smoking cessation program.  Tr. 848-849.  Pugh was receptive to the smoking cessation recommendations but indicated that it was hard for him to quit smoking.  Tr. 849.

On November 1, 2010, Pugh sought treatment at the Medina ER for shortness of breath.  Tr. 878.  A pulmonary function study was performed.  Tr. 883-890.  In the pulmonary function report, it was noted that the study was less than optimal due to increased variability in the spirometry values and difficulty in performing a forced expiratory maneuver but the study was suggestive of an obstructive ventilator defect.  Tr. 883.  On November 23, 2010, Pugh saw Dr. Jain for follow up.  Tr. 971.  Pugh reported doing fairly decent.  Tr. 971.  He was still trying to quit smoking.  Tr. 971.  She advised Pugh to follow up in three months.  Tr. 971.

Pugh saw Dr. Khandelwal on January 24, 2011.  Tr. 976.  He reported that he had quit smoking a month prior.  Tr. 976.  He reported that he was very anxious and irritable.  Tr. 976.  He had no energy and reported feeling tired all the time.  Tr. 976.  He was having trouble sleeping at night.  Tr. 976.  He was not feeling depressed.  Tr. 976.  He had not seen a psychiatrist.  Tr. 976.  He reported feeling short of breath and using his inhaler twice each day.  Tr. 976.  Pugh was using a cane to ambulate and his right leg was braced.  Tr. 977.  Dr. Khandelwal advised Pugh to see a psychologist/psychiatrist.  Tr. 978, 981.

On February 21, 2011, Pugh saw Dr. Khandelwal again complaining of shortness of breath. Tr. 1013. He reported feeling anxious all the time but was not depressed. Tr. 1013. He reported that he had been unable to see a psychiatrist. Tr. 1013. He was advised to call his insurance company to find someone in his plan. Tr. 1013. Pugh was using a cane to ambulate. Tr. 1014. His lower extremities were normal to inspection. Tr. 1014.

Pugh continued to see Dr. Khandelwal and Dr. Jain. Tr. 1016, 1017, 1020, 1024. On June 7, 2011, Pugh reported to Dr. Jain that he was feeling fairly decent. Tr. 988. He was occasionally dizzy. Tr. 988. The nurse indicated his blood pressure was low. Tr. 988. He had no syncope episodes and no shortness of breath or chest pains. Tr. 988. Dr. Jain's assessments included low blood pressure, clinically stable LV dysfunction, and COPD. Tr. 988. Dr. Jain recommended a decrease in Pugh's Lisinopril, close monitoring of his symptoms, follow up in three months and an echocardiogram. Tr. 988. A June 13, 2011, echocardiography report showed normal LV systolic function and a trace of mitral and a trace of tricuspid regurgitation. Tr. 996.

During a July 26, 2011, visit with Dr. Khandelwal regarding his COPD and insomnia, Pugh reported that the humid weather made his breathing worse but overall he was doing okay. Tr. 1029. He indicated that his medicine was helping him sleep a little better. Tr. 1029. His blood pressure was low. Tr. 1031. He reported losing weight. Tr. 1029.

On September 27, 2011, Pugh saw Dr. Jain for follow up. Tr. 989. He reported doing fairly decent. Tr. 989. He had no dizziness but he was tired at times. Tr. 989. He was smoking but reported cutting down. Tr. 989. He had no chest pain. Tr. 989. Dr. Jain's assessments included clinically stable LV dysfunction, well controlled blood pressure, and fairly well controlled hyperlipidemia. Tr. 989. Dr. Jain recommended no changes to Pugh's treatment and

follow up in three to four months.  Tr. 989.   Pugh saw Dr. Khandelwal on September 29, 2011.

Tr. 1037.  He had missed his appointment the day before because he had overslept and he was an

hour late for his appointment on September 29, 2011, because he had overslept.  Tr. 1037.  He

reported feeling sluggish.  Tr. 1037.  He indicated that his breathing had been okay.  Tr. 1037.

Pugh was using a cane to ambulate.  Tr. 1038.  His lower extremities were normal to inspection.

Tr. 1038.

   During an appointment with Dr. Khandelwal on January 31, 2012, Pugh reported having

generalized pain for about 2-3 months.  Tr. 1056.  He indicated that the pain was all over in his

joints and it hurt to get out of bed.  Tr. 1056.  Pugh also reported that his breathing had gotten

worse.  Tr. 1056.  He was still trying to quit smoking.  Tr. 1056.  He had been having difficulties

sleeping.  Tr. 1056.  The medication was not helping much anymore.  Tr. 1056.

### 2.   Opinion evidence

#### a.   Treating source opinions

***Dr. O'Connor***

   On February 25, 2009, Dr. O'Connor prepared a letter to the Bureau of Disability

Determination wherein she indicated that Pugh had been a patient of hers for many years.  Tr.

526.  Dr. O'Connor indicated that Pugh was applying for disability based on allegations of

asthma and right knee problems.  Tr. 526.  She indicated that Pugh had had some minor

intermittent asthma symptoms that did not require long-term or chronic therapy.  Tr. 526.  She

stated that he had recently seen her stating he was applying for disability based on a right knee

injury stemming from a 2008 workers compensation claim.  Tr. 526.  He arrived with a brace on

his right knee.  Tr. 526.  Pugh indicated that he had not had any particular treatment for his knee

since November 2008.  Tr. 526.  He was not on medication and had not had surgery or physical

therapy.  Tr. 526.  She stated:

> I am unsure of the legitimacy of the need for surgery, physical therapy, or any
> other treatment considering he had a Bureau of Workers' Comp, and if he had
> significant issues and it had been evaluated, I would believe that they would have
> already planned for the particular therapy.
>
> As I am not the initial treating physician, and I'm not an orthopedist, I don't
> believe that it is best for me to determine whether or not he has any disability at
> this point in time.  I believe that he does need an evaluation to determine this.
>
> Being that he does complain of a knee problem, the rest of my medical exam I
> found no other deficiencies that would prevent him from working.  He could,
> even with the knee injuries, have a sit-down job.  I did list him as "employable" at
> this point in time.
>
> Again, I have a long history with this gentleman, and I know a bit about his
> character, and I would state that it would be advisable to have an evaluation of his
> knee by an orthopedist to determine whether or not there is any significant issue
> here before allowing him a disability claim.

Tr. 526-527.

Also, as part of the state agency's investigation regarding the veracity of Pugh's

allegations, the state agency noted that, on March 23, 2009, Dr. O'Connor reported that Pugh

was "the biggest manipulator that you will see" and stated that Pugh had "lied to her about

conditions and there is no objective evidence in her charts to state that he has breathing

problems."  Tr. 66.

*Dr. Khandelwal*

On May 16, 2012, following the hearing but prior to the ALJ's decision, Dr. Vivek

Khandelwal completed a Physical Capacities Evaluation ("FCE").  Tr. 1078.  In rendering his

opinion, Dr. Khandelwal adopted the Physical Work Performance Evaluation completed on May

2, 2012, by Ms. Rebecca Linnean PT, DPT.  Tr. 1078, 1079-1090.  Ms. Linnean noted that Pugh

exhibited self-limiting behaviors with respect to the performance of tasks.  Tr. 1079, 1080.

Overall, Pugh self-limited on 37% of the 19 tasks he performed.  Tr. 1079.  Ms. Linnean also

noted several inconsistencies in Pugh's behavior.  Tr. 1079, 1080.  For example, Pugh was

observed squatting to rub his right knee between tasks but was unable to assume the squatting

position to complete tasks indicating that he was unable to squat.  Tr. 1080.  Although his gait

remained antalgic, Pugh's gait was quicker when he was not aware that he was being observed.

Tr. 1080.  Also, Pugh occasionally reached for outside support while ambulating but did not do

so when he was not being "observed."  Tr. 1080.  Ms. Linnean concluded that Pugh's minimal

overall level of work fell within the sedentary range and that he would be able to tolerate

sedentary level of work for 8 hours/day, 40 hours/week.  Tr. 1079.  Ms. Linnean qualified her

findings noting:

> [T]he overall level of work was significantly influenced by the client's self-limiting and inconsistent behavior.  Therefore, the Sedentary level of work indicates a minimum ability rather than a maximum ability.  A maximum overall level of work cannot be determined at this time due to the self-limiting and inconsistent behavior.
>
> ***
>
> [T]he tolerance for the 8-hour day was significantly influenced by the client's self-limiting and inconsistent behavior and indicates his minimal rather than his maximal ability.

Tr. 1079.

### b.  Non-treating source opinions

*State agency reviewing physicians – physical*

On September 30, 2010, state agency reviewing physician, Dr. Leon D. Hughes, M.D.,

completed a Physical RFC Assessment.  Tr. 77-79.  Dr. Hughes opined that Pugh had the RFC to

occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or

walk about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; operation

of right foot controls was limited to occasional; unlimited ability to balance; frequently climb

ramps/stairs and stoop; occasionally kneel and crouch; never climb ladders/ropes/scaffolds or

crawl.  Tr. 77-78.  Pugh would also need to avoid concentrated exposure to extreme heat, cold,

humidity, fumes, odors, dusts, gases, poor ventilation and avoid all exposure to hazards such as

machinery and heights.  Tr. 78-79.

On January 26, 2011, on reconsideration, state agency reviewing physician, Dr. Steve E.

McKee, M.D., affirmed Dr. Hughes's RFC Assessment.  Tr. 107-109.

### State consultative examining psychologist – mental

On March 27, 2011, Dr. James F. Sunbury, Ph.D., ABPP, conducted a psychological

consultative examination.  Tr. 983-987.  When driving to his appointment with Dr. Sunbury,

Pugh's truck broke down.  Tr. 983.  As a result, Pugh walked a mile from where his truck broke

down to the psychologist's office.  Tr. 983.  Pugh described his disability to Dr. Sunbury as

"COPD, asthma, knee, heart, lung condition.  I can't do it any more . . ."  Tr. 983.  Pugh reported

that he had not been hospitalized for psychiatric care and had not had counseling.  Tr. 984.  He

took Lorazepam to help him sleep.  Tr. 984.  Dr. Sunbury reported the results of his mental status

examination and diagnosed Pugh with depressive disorder NOS.  Tr. 985-986.

Dr. Sunbury provided his functional assessment of Pugh's abilities.  Tr. 986.  With

respect to Pugh's abilities and limitations in understanding, remembering and carrying out

instructions, Dr. Sunbury stated that Pugh could repeat five digits forward and three backward.

Tr. 986.  Notwithstanding the fact that Pugh had a GED and served in the military, Dr. Sunbury

opined that Pugh appeared below average in intellectual functioning but would be capable of

managing disability payments in his own best interest.  Tr. 986.  With respect to Pugh's abilities

and limitations in maintaining attention and concentration, and in maintaining persistence and

pace to perform simple tasks and to perform multi-step tasks, Dr. Sunbury noted that, despite

having a very bad day, Pugh maintained concentration during the interview.  Tr. 987.  Dr.

Sunbury also noted that Pugh described doing a good job raising his children.  Tr. 987.  With

respect to Pugh's abilities and limitations in responding appropriately to supervision and to

coworkers in a work setting, Dr. Sunbury noted that Pugh described himself as always irritable.

Tr. 987.  While Pugh had never been fired from a job, Pugh indicated that he would probably be

seen as unfriendly.  Tr. 987.  Dr. Sunbury noted that Pugh was respectful and never unpleasant

during the interview.  Tr. 987.  With respect to Pugh's abilities and limitations in responding

appropriately to work pressures in a work setting, Dr. Sunbury noted that Pugh was taking an

anti-anxiety medication and, based on Pugh's depressed and discouraged mood, Dr. Sunbury

opined that Pugh would have poor work attendance.  Tr. 987.

**C.     Testimonial evidence**

**1.     Pugh's testimony**

Pugh was represented and testified at the administrative hearing.  Tr. 39-63.  Pugh

indicated that he had not worked in years because he is unable to keep his breathing under

control.  Tr. 40.  Pugh indicated he has had emergency room treatment for asthma and his lungs

but was uncertain as to the number of times.  Tr. 45-47.  Pugh also indicated that is unable to

stand for long periods of time due to his right knee problems.  Tr. 40.  In 2007, Pugh injured his

right knee at work at Chick Master while moving a pallet of steel.  Tr. 40-41, 43, 47.  Workers

compensation allowed his claim for a sprain but denied it for a lateral and medial meniscal tear.

Tr. 47.  Pugh had arthroscopic knee surgery in May of 2009.  Tr. 41, 47.  Prior to his surgery, his

knee was constantly swollen; it was like there was a big, hard, swollen ball in his knee.  Tr. 48.

Following his surgery, his knee still swells up and locks up/buckles on him.  Tr. 48.  His knee

still hurts.  Tr. 48-49. He takes Vicodin.  Tr. 49.  He wears a brace on his knee and uses a cane.
Tr. 49.  The cane he had been using was aluminum but his knee buckled on him and, when he
fell he tried to catch himself on the cane, causing the cane to buckle.  Tr. 49-50.

Because of his breathing and his knee problems, Pugh indicated that he did not think he
could perform a job requiring him to lift 20 pounds occasionally/10 pounds frequently and stand
for 6-8 hours a day.  Tr. 50.  Pugh was receiving unemployment in 2010 and, during that period,
he was looking for employment.   Tr. 50.  He indicated that he was looking for jobs that would
allow him to sit and not be on his feet all day or require him to lift heavy objects. Tr. 50-51.  He
indicated that he did not think he could lift or carry 10 pounds very far or for very long because
of his knee.  Tr. 51.  As far as his walking ability, Pugh indicated he felt he could walk from his
apartment to his mailbox which he estimated was about 500 feet.  Tr. 51.  In follow up, the ALJ
inquired about an occurrence from a year prior when his car broke down and he reported walking
about a mile to his appointment with the consultative psychologist.[8]  Tr. 53.  In response, Pugh
indicated that his ability to walk now is less then when he had that appointment.  Tr. 54.

Pugh has cut down on his amount of cigarette smoking.  Tr. 42.  He used to smoke almost
three packs of cigarettes per day.  Tr. 45.  Now, he smokes only about a half a pack per week and
he uses a nicotine patch.  Tr. 42, 45.

Pugh lives independently.  Tr. 42.  He indicated that following his stroke and heart attack
a couple years before, he has had problems with his memory.[9]  Tr. 44.  Because he is forgetful, a
friend visits him every couple weeks to make sure that he has enough food, clean clothes, and
that his medications are filled and in order.  Tr. 43-44.  Pugh drives a stick shift truck.  Tr. 62.

---

[8] Pugh's counsel also asked him about a time in 2010 when Pugh hurt his back helping his friend lifting heavy
shingles.  Tr. 51-52.  Pugh indicated that, although he had his knee problems, he was trying to help a friend but
ended up injuring himself.  Tr. 52.

[9] When testifying about his heart attack, his attorney noted that Pugh had indicated to him that he had had five heart
attacks but the record did not document that and his electrocardiograms had been normal.  Tr. 44-45.

During the hearing, Pugh indicated he had received treatment at the VA for his knee.  Tr. 52.  The ALJ indicated that he was going to subpoena the VA records, send whatever records he received to Pugh's counsel and would possibly hold a another hearing, if necessary.  Tr. 59, 62-63.

### 2.    Vocational Expert's testimony

Vocational Expert ("VE") Barbara Burke testified at the hearing (Tr. 38-39, 63-64) and provided written responses to Vocational Interrogatories submitted by the ALJ (Tr. 360-363).  During the hearing,[10] the VE described Pugh's past relevant work as including work as (1) an industrial truck operator, a semi-skilled, medium level job;[11] (2) an order picker, an unskilled, medium level job;[12] (3) a hand packager, an unskilled, medium level job; (4) a stock clerk, a semi-skilled, heavy level job;[13] and (5) an automobile mechanic, a skilled, medium level job.[14]  Tr. 38-39.  The VE also noted that she was aware that Pugh had performed some other jobs such as machine operator but did not have enough information about those jobs in order to analyze them.  Tr. 39.

The ALJ did not ask the VE hypothetical questions during the hearing.  However, the ALJ submitted Interrogatories to the VE following the hearing which the VE completed on April 30, 2012.  Tr. 360-363.  In the Interrogatories, the VE was presented with a hypothetical question

---

[10] The record also contains a 15 Year Work Summary completed by the VE on February 21, 2012.  Tr. 359.

[11] The VE indicated that Pugh performed the industrial truck operator job at the heavy level.  Tr. 38.

[12] The VE indicated that Pugh performed the order picker job at the heavy level.  Tr. 38.

[13] The VE indicated that Pugh performed the stock clerk job at the medium level.  Tr. 39.

[14] The VE indicated that Pugh performed the automobile job at the heavy level although she was not certain how many years he had performed the job and could not say whether he had performed it long enough to develop the skills.  Tr. 39.

asking her to assume a hypothetical individual of Pugh's age, education and work experience and to assume that the individual could perform light work except:

> lift and/or carry 20 pounds occasionally but only 10 pounds frequently; stand and/or walk for about 6 hours per 8-hour workday; sit for a total of about 6 hours per 8-hour workday; only occasional operation of foot control with the right lower extremity; frequent climbing of ramps and stairs but never ladders, ropes, or scaffolds; frequent stooping but only occasional kneeling and crouching and never crawling; must avoid concentrated exposure to extreme cold and heat in addition to humidity, fumes, odors, dusts, gases, and poor ventilation; and must avoid all hazardous machinery and unprotected heights.

Tr. 361.  In response, the VE indicated that the described individual would be unable to perform Pugh's past relevant work.  Tr. 361.  She was then asked whether the described individual could perform any unskilled jobs that exist in the national economy.  Tr. 362.  The VE indicated that the described individual would be able to perform unskilled jobs that exist in the national economy, including (1) cashier II, a light, unskilled job with 8,400 jobs available in Northeast Ohio and 1,120,000 nationwide; (2) fast food worker, a light, unskilled job with 6,800 jobs available in Northeast Ohio and 1,500,000 nationwide; and (3) coffee shop attendant, a light, unskilled job with 1,400 jobs available in Northeast Ohio and 153,000 nationwide.  Tr. 362.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[15] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[16] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[17] *see also* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[15] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[16] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[17] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his May 22, 2012, decision, the ALJ made the following findings:[18]

1.  Pugh met the insured status requirements through December 31, 2013. Tr. 14.

2.  Pugh had not engaged in substantial gainful activity since November 1, 2007, the alleged onset date.  Tr. 14.

3.  Pugh had the following severe impairments: degenerative joint disease of the right knee, asthma, heart disease, depressive disorder, and polysubstance abuse.  Tr. 14.

4.  Pugh did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 14-16.

5.  Pugh had the RFC to perform light work with the following additional limitations: can occasionally operate foot controls with the right lower extremity; can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; can frequently stoop but can only occasionally kneel and crouch but never can crawl; must avoid concentrated exposure to extreme cold and heat in addition to humidity, fumes, odors, dusts, gases, and poor ventilation; must avoid all exposure to hazardous machinery and unprotected heights; and mentally, limited to the performance of unskilled jobs due to deficits in concentration, persistence, and work pace.  Tr. 17-20.

6.  Pugh was unable to perform past relevant work. Tr. 21.

7.  Pugh was born in 1961 and was 46 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr.21.

8.  Pugh had at least a high school education and was able to communicate in English.  Tr. 21.

---

[18] The ALJ's findings are summarized.

9.    Transferability of job skills was not material to the determination of disability.  Tr. 21.

10.   Considering Pugh's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Pugh could perform, including cashier II, fast food worker, and coffee shop attendant.  Tr. 21-22.

Based on the foregoing, the ALJ determined that Pugh had not been under a disability from November 1, 2007, through the date of decision.  Tr. 22.

## V. Parties' Arguments

### A.    Plaintiff's arguments

Pugh presents four arguments for review.   First, Pugh argues that he turned 50 almost one year prior to the administrative hearing and the ALJ did not note the change in Pugh's age category or consider it when evaluating Pugh's treating physicians' opinions.  Doc. 17, pp. 4-5, Doc. 19, p. 2.  Pugh argues that the ALJ's mistake was not harmless because someone aged 50 with a limitation to sedentary work (as opined by his treating physicians) would be deemed disabled under the Grids.[19]  Doc. 17, p. 4, Doc. 19, p. 2.

Second, Pugh argues that the ALJ violated the treating physician rule with respect to Dr. O'Connor.  Doc. 17, pp. 5-8, Doc. 19, pp. 2-3.  Pugh contends that the ALJ did not provide good reasons for providing less than controlling weight to Dr. O'Connor's opinion and was mistaken that a limitation of a "sit-down" job would result in a decision adverse to Pugh's position.  Doc. 17, pp. 5-8, Doc. 19, pp. 2-3.

---

[19] The Medical-Vocational Guidelines, known as the "Grids," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grids").  The Grids include rules that may be applied in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work. 20 C.F.R. § 404.1569.  The rules do not cover all possible variations of factors.  *Id.*  "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled."  20 C.F.R. Part 404, Subpart P, § 200.00 of Appendix 2.  However, "[w]here any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled."  *Id.*

Third, Pugh argues that the ALJ violated the treating physician rule with respect to Dr. Khandelwal's endorsement of a functional capacity evaluation which limited Pugh to standing occasionally and an overall work level of "sedentary."  Doc. 17, pp. 8-10, Doc. 19, pp. 4-6.

Fourth, Pugh argues that the ALJ found that Pugh had "moderate" limitations in concentration, persistence or pace but did not account for those limitations in the RFC or VE hypothetical.  Doc. 17, pp. 10-13, Doc. 19, pp. 6-7.

**B.      Defendant's arguments**

In response, the Commissioner asserts that Pugh's argument regarding the ALJ's failure to apply the more advanced age when assessing whether Pugh was disabled assumes a sedentary level of work.  Doc. 18, pp. 9-10.  However, the ALJ found that Pugh had the RFC to perform light work.  Doc. 18, pp. 9-10.  Since the Grids would direct a finding of not disabled for an individual with Pugh's education, past relevant work, and a limitation of light work in either the younger person age category or closely approaching advanced age category, the Commissioner argues that Pugh is unable to demonstrate that the ALJ's failure to apply the more advanced age had an impact on the outcome of the case.  Doc 18, pp. 9-10 (referencing 20 C.F.R. Part 404, Subpart P, §§ 202.14, 202.21 of Appendix 2).  Additionally, the Commissioner argues that, since the ALJ found both exertional and non-exertional limitations, the ALJ properly consulted a VE rather than relying only on the Grids.  Doc. 18, p. 10.

The Commissioner also argues that substantial evidence supports both the RFC as determined by the ALJ and the weight assigned to the medical opinion evidence.  Doc. 18, pp. 10-16.

Finally, the Commissioner argues that the ALJ adequately accounted for Pugh's mental limitations in the RFC.  Doc. 18, pp. 16-17.

**VI. Law & Analysis**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.     The ALJ's failure to note the change in Pugh's age category from younger individual to closely approaching advanced age did not impact the outcome of the case**

At the time of the hearing, Pugh had already turned 50 years of age and indicated that he was turning 51 the following month, i.e., in March 2012. Tr. 41. In his decision, the ALJ found that Pugh was a younger individual, age 18-49, on the alleged disability onset date. Tr. 21. This finding is not in error. However, Pugh takes issue with the ALJ's failure to acknowledge a

change in age category from younger individual (under 50 years of age) to closely approaching advanced age (age 50-54) for the one year period prior to the hearing.  Doc. 17, pp. 4-5, Doc. 19, p. 2; *See* 20 C.F.R. § 404.1563 (describing age categories).

The Commissioner contends that, because the ALJ's RFC limits Pugh to light rather than sedentary work, the ALJ's failure to recognize the change in Pugh's age did not impact the outcome because, with a light exertional RFC as found by the ALJ, the change in age would not alter the finding of no disability under the Grids.  Doc. 18, pp. 9-10.   Pugh acknowledges that the ALJ's mistake would only impact the outcome if Pugh was limited to sedentary work but argues that the ALJ improperly weighed the opinions of his treating sources who limited him to sedentary work.  Doc. 17, p. 4, Doc. 19, p. 2.

As discussed below, the ALJ properly weighed the treating sources opinions and determined that a sedentary RFC was not supported by the evidence.  Accordingly, reversal and remand is not warranted for further evaluation of the change in Pugh's age during the period of alleged disability.

**B.     The  ALJ properly evaluated the opinions of Pugh's treating physicians**

Pugh argues that the ALJ failed to evaluate the opinions of his treating physicians Dr. O'Connor and Dr. Khandelwal in accordance with the treating physician rule.  Doc. 17, pp. 5-10, Doc. 19, pp. 2-6.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 20*13) (citing 20 C.F.R. § 404.1527(c )(2)); see also Wilson v. Comm'r of Soc. Sec.*,

378 F.3d 541, 544 (6th Cir. 2004).   If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Relying on *Gayheart and Wilson*, Pugh argues that the ALJ did not comply with the requirements of the treating physician rule.  However, as discussed below, the Court finds no error in the ALJ's evaluation and weighing of the opinions of Drs. O'Connor and Khandelwal.

**1.  Dr. O'Connor**

Pugh claims that the ALJ failed to provide good reasons for providing less than controlling weight to Dr. O'Connor's opinion.   However, as discussed more fully below, Pugh has failed to demonstrate that reversal and remand is warranted based upon the ALJ's evaluation of and explanation of the weight assigned to Dr. O'Connor's opinion. In explaining the weight assigned to Dr. O'Connor's opinion, the ALJ stated:

> I give only some weight to the opinion of treating physician Luan O'Connor M.D. who stated that the claimant is generally employable despite his physical impairments, and that he likely requires a "sit-down" job (4F2).  I do not give controlling weight to Dr. O'Connor's opinion (although doing so would result in a

decision adverse to the claimant's position) because her opinion is vague and does not specify either the claimant's function-by-function limitations, or what exactly constitutes a "sit-down" job.  That is, her opinion does not assist much in reaching a function-by-function residual functional capacity in this matter.

Tr. 19-20.

An opinion on an issue reserved to the Commissioner, such as what an individual's RFC is, may not be ignored but, even if rendered by a treating physician, such an opinion is never entitled to controlling weight.  *See* SSR 96–5p, 1996 WL 374183, * 2 (July 2, 1996); *see also Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) ("If the treating physician . . . submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors – [the ALJ's] . . . decision need only explain the consideration given to the treating source's opinion." ) (internal quotations and citations omitted); *see also Grider v. Comm'r of Soc. Sec.,* 2011 WL 1114314, * 4 (S.D. Ohio Mar. 25, 2011) (recognizing that a physician's "'sedentary' assessment was a conclusion on an issue reserved to the Commissioner").  Here, Pugh argues that Dr. O'Connor's statement that Pugh could have a "sit-down" job was an opinion that he was limited to a job that allowed sitting all or most of the time, i.e., sedentary work.  Doc. 17, pp., 7, 10.  Since that opinion is an opinion regarding Pugh's RFC it is not entitled to controlling weight.  *Id.*

Even if Dr. O'Connor's opinion was not an opinion on an issue reserved to the Commissioner, the ALJ clearly discussed and explained the consideration he gave to Dr. O'Connor's opinion.  Tr. 19-20.  Pugh takes issue with those reasons and contends that the reasons are not "good reasons."  Doc. 17, pp. 6-7.  Pugh apparently takes issue with the ALJ's finding that Dr. O'Connor's opinion was vague.  For example, he challenges the ALJ's statement that Dr. O'Connor opined that Pugh "*likely* requires a 'sit-down' job'" and argues that Dr.

O'Connor's opinion, in plain English, meant that he could perform a job that allowed sitting all or most of the time.  Doc. 17, p. 7 (emphasis supplied).   Thus, he contends that reversal and remand is required so that the ALJ may better explain his understanding that Dr. O'Connor opined that Pugh "likely requires" rather than "requires" a sit-down job.  Doc. 17, p. 7.  However, Pugh fails to note that Dr. O'Connor qualified her February 25, 2009, opinion significantly by noting that she was not Pugh's initial treating physician or an orthopedist so she did not feel it was best for her to determine whether or not he had any disability and she felt that, based on her long history with Pugh and knowledge of his character, it would be advisable to have an evaluation of his knee by an orthopedist in order to determine whether or not there was any significant issue with his knee.  Tr. 526-527.  In light of her qualified opinion, the ALJ's decision to discount the opinion based on its vagueness is sufficiently clear and supported by the evidence.  The ALJ also found that the opinion was not entitled to controlling weight because it did not contain function-by-function limitations.  Tr. 19.  Pugh claims that an opinion need not contain function-by-function limitations to be entitled to weight.  Doc. 17, p. 7.  Yet, because of the lack of specific functional limitations, Dr. O'Connor's opinion was not well supported.  Accordingly, the ALJ properly found it was not entitled to controlling weight.

The foregoing demonstrates that ALJ provided good reasons for providing less than controlling weight to Dr. O'Connor's opinion and Pugh has failed to argue or demonstrate that the RFC is not supported by substantial evidence.[20]   Accordingly, the Court finds no error with the ALJ's treatment of Dr. O'Connor's opinion.

---

[20] Pugh appears to raise a challenge to the RFC within his argument regarding the weight assigned to Dr. O'Connor's opinion.  He contends that the ALJ's decision to limit Pugh to occasional operation of foot controls with the right lower extremity due to the stress such activity would place on the right knee is inconsistent with the RFC finding of light work because there is no evidence that operating foot controls would place more stress on the knee than standing or walking.  Doc. 17, p. 8.  However, his argument is conclusory, unsupported, and not fully explained.  "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving

### 2. Dr. Khandelwal

Pugh claims that the ALJ failed to conduct a proper analysis of Dr. Khandelwal's opinion under the treating physician rule. However, as discussed below, Pugh has failed to demonstrate that reversal and remand is warranted based upon the ALJ's evaluation of and explanation of the weight assigned to Dr. Khandelwal's opinion. In explaining the weight assigned to Dr. Khandelwal's opinion, the ALJ stated:

> I give little weight to the opinion of Dr. Vivek Khandelwal M.D., being a physician who conducted a functional evaluation of the claimant on May 16, 2012 (*hereinafter,* FCE). Dr. Khandelwal stated that the claimant was limited to sedentary work, with only frequent trunk rotation, and no kneeling, squatting, crawling, climbing of stairs, or climbing of ladders (FCE). I give little weight to this opinion because Dr. Khandelwal notes that the claimant's functioning was inconsistent through the examination, with various signs of apparent symptom magnification (FCE, p. 14). For example, Dr. Khandelwal notes that the claimant's gait was significantly quicker when the claimant believed he was not being observed, as compared to when he was asked to walk for purposes of the evaluation (FCE, p. 14). In addition, Dr. Khandelwal noted that the claimant was able to squat to rub his knee for relief, but failed to squat when asked to do so as part of the examination (FCE, p. 14). Yet despite such signs of symptom magnification, Dr. Khandelwal states that the claimant cannot squat. Such a limitation is not consistent with Dr. Khandelwal's own observation of the claimant actually squatting. In addition, the limitation to sedentary work is also not consistent with Dr. Khandelwal's observations of improved gait when claimant thought he was unobserved, and with the inconsistencies noted concerning the claimant's abilities to lift and carry objects weighing more than ten pounds (FCE, p. 4). Furthermore, Dr. Khandelwal's opinion is simply not supported by the medical evidence of record, namely the relatively normal LVEFs (8F5; 24F6; 30F7), the claimant's ability to walk a mile at a time (29F2), and the general lack of signs of severe right knee pain (10F6; 16F3; 29F2).

Tr. 20.

Initially, Pugh takes issue with the ALJ's failure to identify Dr. Khandelwal as a treating physician. Doc. 17, p. 9. Notwithstanding the lack of identification of Dr. Khandelwal as a

---

the court to . . . put flesh on its bones." *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted). Even if not waived, Dr. Hughes, the state agency reviewing physician, opined that Pugh could perform light work with the limitation of occasional operation of foot controls with the right leg. Tr. 91-92. The ALJ gave significant weight to Dr. Hughes's opinion. Tr. 20. Thus, Dr. Hughes's opinion provides support for the RFC of light work with occasional operation of foot controls with the right leg and Pugh's suggestion that the RFC is inconsistent or unsupported by the record is without merit.

treating physician, the ALJ considered the opinion and explained the weight assigned.  Here, although Dr. Khandelwal was a treating physician, when offering his FCE opinion, he simply adopted the report of Ms. Linnean, a non-physician, who had conducted a Physical Work Performance Evaluation of Pugh.  Tr. 1078-1090.   Nonetheless, the ALJ considered the opinion and attributed Ms. Linnean's observations and assessments to Dr. Khandelwal and weighed the opinion.  Tr. 20.  In doing so, the ALJ noted in detail inconsistencies observed during the evaluation and found that the limitation of sedentary work was not consistent with those observations.  Tr. 20.  Further, the ALJ found that the limitation of sedentary work was unsupported by other evidence of record.  Tr. 20.   Pugh has not demonstrated that the ALJ's explanation is not sufficiently clear to allow for meaningful judicial review or that it is unsupported by the record.[21]

Moreover, because of Pugh's significant self-limiting and inconsistent behavior, Dr. Khandelwal opined that the sedentary assessment represented Pugh's *minimal* rather than maximum ability noting that Pugh's maximum ability could not be determined.  Tr. 1079.  Accordingly, even if Dr. Khandelwal's opinion was deserving of controlling weight, that opinion did not address the most that Pugh could do.  *See* SSR 96-8p, 1996 WL 374184, * 1 (July 2, 1996) ("RFC is not the *least* an individual can do despite his or her limitations, but the *most*") (emphasis in original). Further, as discussed above with respect to Dr. O'Connor's opinion, an opinion on an issue reserved to the Commissioner, such as what an individual's RFC is, even if

---

[21] Pugh's arguments that the ALJ misrepresented the record regarding Pugh's ability to walk, including his ability to walk a mile (Doc. 17, p. 9), does not persuade the Court that reversal and remand is warranted.  The record reflects that Pugh did in fact walk a mile in order to get to his consultative psychologist's evaluation (Tr. 983) and that he walked for over an hour one day on grass surfaces with hills (Tr. 564).  These records, while not recited verbatim by the ALJ in the decision, were relied upon by the ALJ in support of his determination that Pugh was not as limited as alleged.  Also, while the ALJ did not specifically mention Pugh's knee surgery, the ALJ considered Pugh's knee impairment and specifically referred to physical therapy records that referenced Pugh's arthroscopic knee surgery. Tr. 18 (referencing 10F6 (Tr. 564)).  Accordingly, to the extent that Pugh suggests that reversal and remand is warranted because the ALJ did not fully consider the record, Pugh's arguments are unpersuasive.

rendered by a treating physician is never entitled to controlling weight.  *See SSR 96–5p, 1996 WL 374183, * 2 (July 2, 19*96); *see also Johnson*, 535 Fed. Appx. at  505.   Dr. Khandelwal's opinion that Pugh's overall work level fell within the sedentary range is an opinion regarding Pugh's RFC which is an issue reserved to the Commissioner and therefore not entitled to controlling weight.[22]  *Id.*

Based on the foregoing, the Court finds no error with the ALJ's treatment of Dr. Khandelwal's opinion.

**C.**     **The ALJ adequately accounted for Pugh's mental impairments in the RFC and VE hypothetical**

Relying on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), Pugh argues that, although the ALJ concluded at Step Three that Pugh had moderate limitations in concentration, persistence or pace, the ALJ did not adequately account for those limitations in the RFC or VE hypothetical.  Doc. 17, pp. 10-13, Doc. 19, pp. 6-7.

In *Ealy*, the ALJ relied upon a physician's assessment that included speed and pace based restrictions.  594 F.3d at 516.  However, the ALJ did not rely on vocational expert hypothetical containing a fair summary of those speed and pace based restrictions.  *Id.*  Instead, the ALJ's hypothetical only limited the claimant to simple, repetitive tasks and instructions.  *Id.*  The Sixth Circuit concluded that the hypothetical did not adequately describe the claimant's limitations and, as a result, the vocational expert's testimony did not constitute substantial evidence in support of the ALJ's Step Five determination.  *Id.*at 516-517.   *Ealy*, however, does not establish a bright-line rule for how ALJs must account for limitations in concentration, persistence or pace.  *See Jackson v. Comm'r of Soc. Sec.*, 2011 WL 4943966, *4 (N.D. Ohio Oct. 18, 2011) (finding that

---

[22] With respect to the portion of the opinion limiting Pugh to standing "occasionally," the FCE notes that Pugh self-limited on that task.

"*Ealy* stands for a limited, fact-based, ruling in which the claimant's particular moderate limitations required additional speed - and pace-based restrictions").

Here, in assessing the severity of Pugh's mental impairment, at Step Three, the ALJ evaluated Pugh's impairment using the "paragraph B" criteria.  Tr. 15-16.  The ALJ found moderate limitations in concentration, persistence or pace at Step Three noting that Pugh had struggled on his mental status examination during his consultative examination with memory and abstract reasoning. Tr. 15-16.  However, as part of his Step Three analysis, the ALJ also noted that Pugh was able to focus on the tasks; had no struggles with tasks such as serial three additions; and had not reported any problems with concentration, persistence or pace when describing past work.  Tr. 15.  Moreover, as part of his RFC analysis, the ALJ did not simply adopt his Step Three finding regarding concentration, persistence or pace.  *See* SSR 96-8p, 1996 WL 374184, * 4 ("[T]he limitations identified in the 'paragraph B' . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." ).  Rather, the ALJ discussed in detail Pugh's mental health impairment and determined that mentally Pugh had the RFC to perform unskilled work.[23]  Tr. 19.  For example, the ALJ noted that Pugh's denial of internal thought disturbances such as suicidal ideation or hallucinations indicated that he was not prone to internal distractions.  Tr. 19, 985.

Pugh has failed to demonstrate that greater mental limitations than those identified by the ALJ were required or supported by the record.  *Jackson*, 2011 WL 4943966, * 4.  To the extent that Pugh contends that the ALJ should have included additional limitations to account for deficits in concentration because he found that Pugh had struggled on his mental status examination, (Doc. 17, p. 11), Pugh fails to recognize that the ALJ also found that Pugh was

---

[23] Unskilled work involves simple, repetitive and routine tasks.  *Allison v. Apfel*, 229 F.3d 1150, *4 (6th Cir. 2000).

nonetheless able to focus and had no struggles with tasks such as serial three additions. Tr. 15; *see also* Tr. 987 (consultative examining psychologist stating that "Despite his having a very bad day, he maintained concentration during the interview.").

Based on the foregoing, the Court finds that the ALJ's RFC and VE hypothetical which limited Pugh mentally to unskilled work (Tr. 17, 361-362) are supported by substantial evidence and Pugh has failed to demonstrate that greater mental limitations were required.  Accordingly, reversal and remand is not warranted.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  February 2, 2015

Kathleen B. Burke
United States Magistrate Judge